# JUDGE DAVID BRIONES

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

FILED
NOV 04 2019
CLERK U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY

SAMUEL VELASCO-GURROLA,  )

    Petitioner,             )

                          )      **MEMORANDUM OF LAW**

    Vs.                 )

                          )      **Crim No. 3:15-CR-01646-DB**

UNITED STATES OF AMERICA  )

    Respondent.         )      **EP 19 CV 0320**

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C 2255.

----------------------------------------------------------------------------------------------------

    Samuel Velasco-Gurrola ("Velasco"), hereby acting Pro se, respectfully moves to vacate, Set Aside, or Correct his sentence pursuant to the present 28 U.S.C 2255 motion. Petitioner respectfully requests that this Honorable Court make the proper findings and provide relief from a conviction and sentence that was imposed herein in violation to the United States constitution and laws of the United States. Attached to this Motion petitioner presents Memorandum of Points and Authorities in support. In addition, Vazquez attached a Declaration by Samuel Velasco Gurrola in support of the arguments presented throughout the present petition.

At the week-long trial, the Government produced nearly twenty witnesses, but none more important than Arturo Garcia. Arturo testified extensively to conversations he both participated in and overheard in which Samuel Velasco Gurrola, Alan Garcia, and others devised a plan to kill Ruth and her family. Arturo Garcia further testified that, after Ruth Sagredo's murder, Velasco-Gurrola admitted to the murders of Francisco Sagredo, Cinthia Sagredo and Ruth Sagredo and her then boyfriend.

## VI. ARGUMENTS PRESENTED FOR REVIEW

### A. WHETHER COUNSEL RENDERED INEFFECTIVE ASSITANCE BY NOT MOVING TO DISMISS COUNT 4,5,6, AND 7 OF THE INDICTMENT BASED ON THE EXTRATERRITORIAL APPLICATION OF SECTION 1958(a).

Samuel Velasco Gurrola was charged and convicted of (4) Four Counts of Conspiracy to Cause Travel a Foreign Commerce in the Commission of Murder-for-Hire in violation of 1 Title 18 U.S.C Section 1958. (See Counts 4,5,6 and 7 of Second Amended Judgment Doc. # 313). Velasco was sentenced to Life on each of the Four Counts to run consecutive to the rest of Counts as described in his indictment. Id.

Counts Four, Five, Six and Seven of the Indictment charge Velasco with committing and conspiring to commit murder for hire in violation of 18 U.S.C. section 1958(a). That statute, in relevant part, makes it a crime to "travel[] in or cause[] another . . . to travel in interstate or foreign commerce . . . with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C.S. § 1958(a).

Section 1958(a), by its plain terms, criminalizes not murder, but (1) interstate or foreign travel, (2) with the intent to commit a murder in violation of Federal or State law, (3) for pecuniary gain. See, e.g., United States v. Delpit, 94 F.3d 1134, 1149 (8th

3

Cir. 1996) ("[Section 1958] does not prohibit murder or attempted murder. Instead, it outlaws using interstate-commerce facilities with the intent that murder-for-hire be committed. Once the interstate-commerce facility is used with the required intent the crime is complete.").

Velasco presents that the Indictment represents an extraterritorial application of Section 1958(a) is unavailing, as the Indictment plainly charges him or whoever committed the murders with traveling in foreign commerce from within the United States to the Juarez, Mexico, thus not satisfying the objective element of the offense. Charging a defendant with a federal crime whose objective elements are satisfied by allegations of actions committed by the inside the United States is not an extraterritorial application of federal criminal law. Cf. United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (discussing the presumption against extraterritoriality as operating when an indictment concerns "conduct outside the territorial jurisdiction of the United States"). However, here, the plain language of the statute requires that either Velasco or members of the conspiracy traveled outside the United States to commit murder. The sufficiency of the evidence that they actually intended to commit murder at the time they departed from the United States are ones for the jury; at this stage, the Government's allegation concerning such intent was unsatisfied by any evidence.

The Indictment is nonetheless defective with respect to the crimes charged in Counts Four, Five, Six and Seven because it does not identify, or allege facts demonstrating that the murder in Juarez, Mexico violated, any provision of State or Federal law that prohibited the alleged murder, and thus does not sufficiently allege the mens rea element of the offenses charged in those Counts, which requires that Velasco intended to commit a murder that would violate Federal or State law.

Although, Velasco's crime is a conspiracy and not a substantive murder, Section 1958(a), by its plain terms, criminalizes not murder, but (1) interstate or foreign travel, (2) with the intent to commit a murder in violation of Federal or State. Which by its terms requires that either Velasco, or the people who committed the murder, or at the least the weapons utilized to cause the murder were part of violating interstate commerce.

Title18 U.S.C.S. § 2332 deals with substantial crimes ("Whoever kills a national of the United States, while such national is outside the United States . . . ."), however, here, the government came short from satisfying (1) That the victims where U.S.

4

Citizens or Nationals (2) that the people causing the substantial crime or Gurrola traveled outside the United States with the intent to commit the crime. Absent a Federal or State law criminalizing the murder of a non-United States national abroad under the circumstances alleged in the Indictment, the Government cannot establish intent to commit a murder in violation of Federal or State law, which is a necessary component of the mens rea element of Section 1958. Because there appears to be no such law, the Indictment fails to allege a violation of Section 1958. Accordingly, Count Four, Five, Six and Seven (Conspiracy to Commit Murder-for-Hire) of the Indictment must be dismissed.

Illustrating is <u>United States v. Samia</u>, 1:13-CR-521-LTS (Dist. Court, SD New York 2017). Samia was charged with Counts One and Two of the Indictment, violations of 18 U.S.C. section 1958(a), which requires, in relevant part, that Defendants have used a facility of interstate or foreign commerce "with intent that a murder be committed in violation of the laws of any State or the United States." The Indictment alleged that the Defendants traveled in foreign commerce in connection with the murder of Catherine Lee, a non-U.S. national, in the Phillippines. See Samia, 2016 WL

On August 19, 2016, Samias' co-defendant Stillwell moved, inter alia, to dismiss Counts One and Two of the Indictment. (Docket entry no. 345.) In his memorandum of law in support of the motion, Stillwell argued that Section 1958 should not be read to have extraterritorial effect (i.e, application in connection with a murder that allegedly took place outside of the United States). In the course of making that argument, which the motion characterized as a "jurisdictional" challenge, Stillwell noted that "[d]espite Section 1958's reference to a murder in violation of any of the laws of the United States, the Government has identified no other homicide statute to close this jurisdictional loophole." (Docket entry no. 346, Mem. of Law in Support of Motion to Dismiss, p. 13 n. 8.) Defendant Samia later joined the motion. In response, the Government asserted that the Indictment sufficiently alleged violations of Section 1958 because it alleged that Defendants possessed "the intent to commit a murder in violation of Section 956," which the Government described as "the object murder offense." (Docket entry no. 349, Mem. of Law in Opposition, p. 15.)

Gurrola urges that his circumstances clearly mirror those in Samia, and his trial attorney failed to move to dismiss the charges as alleged in his indictment. Because

the government came short from establishing that Velasco or any of the people involved in the commission of the murders in Juarez traveled interstate this case represents extraterritorial concerns; it is a matter of jurisdiction in which boundaries are being trespassed.

It is wort repeating that 1958(a), by its plain terms, criminalizes not murder, but (1) interstate or foreign travel, (2) with the intent to commit a murder in violation of Federal or State, and here the government came short in establishing interstate or foreign travel. Wherefore, thus court must remand with instructions that all charges pertaining to 18 U.S.C Section 1958(a) be dismissed. Additionally, because his trial attorney rendered ineffective assistance of counsel for not addressing this matter in a timely and proper manner.

## B. WHETHER COUNSEL RENDER INEFFECTIVE ASSITANCE BY NOT OBJECTING TO THE IMPARTIALITY DURING THE INTRODUCTION OF AN UNRELATED AND DISMISSED STATE CASE INVOLVING SEXUAL ASSAULT OF HIS EX-WIFE'S MINOR CHILD

The extructure of Velasco's case begins with Velasco marring Ruth Sagredo Escobedo ("Ruth"). A few months later, Ruth accused Velasco of sexually assaulting Ruth's five-year-old daughter and Ruth filing criminal charges against Velasco in the Texas State Court. The state filed charges against Velasco in 2005.

According to the theory of this case, after Velasco became aware that Ruth was going to testify as the "outcry" witness, Velasco began searching for a way to prevent Ruth from testifying. The theory of this case is that in May 2008, during a pretrial hearing, Velasco threatened Ruth if she did not drop the case. Accordingly, during the same event Velasco had pointed at Ruth's father (Fransico Villareal) and had stated that he "would start with him." According to the Government, it was the same Ruth who urged the prosecutor of the state and mentioned these facts.

However, this theory was part of prosecution's strategy in fulfilling the gaps in the criminal case, no substantial evidence was ever presented formally.

On October 3, 2008, a group of masked individuals invaded Francisco's home,

murder him and stole approximately $140,000 from his safe. According to the statement of Arturo Garcia (Government's witness) during a meeting with Emmanuel, Dalia, Alan Garcia at Dalia's residence in El Paso, Velasco had orchestrated the plan of murdering Ruth. Ruth and her then boyfriend, Roberto Martinez where ambushed and murder in Juarez while attending to Ruth's sister Cinthia's funeral.

On December 9, 2008, Velasco appeared ready to begin trial on the sexual assault charge. However, the State of Texas ultimately dismissed the case.

Velasco was arrested on September 23, 2015 under a federal warrant for conspiring to murder or cause the murder of Ruth, Francisco, Cinthia, and Roberto.

Because Velasco was not convicted of sexual assault charges in the state court, mentioning this fact at any event during his murder charges and process was highly contaminating and prejudicial, considering that it was a five-year-old child involved.

It is critical and worth clarifying that Velasco was not convicted of Sexual Assaulting nobody. Mentioning this matter to the jury or mentioning this matter in general was highly prejudicial and exposed the case to a different and negative perception to the jury and anyone that heard this matter. Velasco was charged with conspiracy to commit murder, mentioning the sexual assault was unnecessary and in bad faith in the government's part. The government could have proved its case by simply stating that Velasco conspired to murder individuals to prevent them to testify in an unrelated state case without giving mention that the case involved a sexual assault to a minor. This honorable court may concede that prejudice was eminent, that perception was key in determining culpability and that the strategy of the government was somewhat vindictive and with the sole purpose of putting Velasco in disadvantage.

The Sixth Amendment to the United States Constitution sets forth rights related to criminal prosecutions including the right to a public trial without unnecessary delay, the right to a lawyer, the right to an impartial jury.

Without a doubt impartiality was at all times a matter of concern here, even when the court could instruct the jury not to account the state sexual assault to a minor charge. It is illustrating and presumed that many of the jurors were father or mother of children allowing them to hear unrelated information violated Velasco's constitutional rights. **Id. Const. Sixth Amendment.**

7

The trial court had no legal right to strip Velasco from his constitutional rights. Constitutional rights may not be invoked partially or discriminatory. The equal protection provides that all people must be treated equal when similarly situated. The Equal Protection Clause of the Fifth and Fourteenth Amendment is essential a direction that all persons similarly situated be treated alike. See. <u>Cleburne v. Cleburne Living Center, Inc.</u>, 473 U.S 432 (1985).

Gurrola prays that this honorable court remand his case with instructions that he be retried his jury trial, without giving mention to the State Sexual Assault to a Minor information, because this information has no play in the federal court but constituted vindictiveness in the government's part. The mentioning of irrelevant facts was in bad faith, Velasco's case was highly prejudiced because such information was decisive in rendering partial decision, his attorney was ineffective by not properly raising this matter in a proper and timely manner.

Velasco should prevail under the above-mentioned argument.

### C. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR NOT CHALLENGING PROSECUTORIAL MISCONDUCT DURING THE PRESENTATION OF EVIDENCE AGAINST SAMUEL GURROLA.

### 1. <u>Cesar Silva's false testimony.</u>

In the case at hand, key witness to the case of Samuel Velasco was government witness Cesar Silva. According to the record of government case, Silvas' role in presenting this case was that Emmanuel Velasco (Samuel Velasco' Brother) has told him around late 2008 or early 2009 about the murders. According to Silva, Emmanuel Velasco for recruitment purposes had told him "We Killed the wife (Ruth), so she would not testify at trial."

What Silva referred to, was that Emmanuel Velasco has confessed the him in joint of his brother Samuel Velasco had caused the murders of Cinthia Sagredo, Ruth

Sagredo Escobedo, Roberto Martinez and Ruth's father Francisco Sagredo on November 22, 2008 in Juarez Mexico. **See. Direct Examination of Silva.**

Because this testimony was taken as being the truth, and no timely abjection or motion to disqualify witness was ever made, Silvas' testimony was presented and without a doubt contaminated the jury's perception. Silva's testimony was highly prejudicial and decisive in rendering Samuel's conviction.

In rendering ineffective assistance, it is worth addressing that trial counsel failed to timely move to disprove Silva's testimony during direct examination, however, became aware of the error committed while cross examination. During Cross examination Mr. Benjamin attempts to cure his error by addressing facts not presented in direct. Mr. Benjamin first presents that witness Silva was indeed motivated to lie during trial because charges were being dismissed against him. Then he attempts to present that Silva had contradicted himself in multiple occasions.

BY MR. BENJAMIN:

Q. Part of your plea agreement that we looked at yesterday is

a dismissal of that pending charge, correct?

A. Yes, sir.

Q. And I asked you yesterday if you – excuse me.

I asked you yesterday if, in May of 2015, you were

asked about the killing of Samuel Velasco's wife, and you said you didn't know about that, correct?

A. Correct.

Q. That you did not know about the killing of Samuel Velasco's

Wife, was what your statement was at that time.

A. Yes, sir.

Q. And then you were asked the same question a month later,

and you knew about the killing of Samuel Velasco's wife,

correct? **See. Silva's Cross Tt. 5-6 Vol. 3 of 5**

9

The government allowed witness Silva to present non-existent evidence, lies to the jury during trial, without the minimum remorse. Velasco's trial counsel simply turned a blind eye to the fact that there is a time and an specific order during the proceedings to file and object to prejudicial evidence. It seems like Mr. Benjamin was not familiar with the trial or criminal proceedings. See <u>United States v. Cronic</u>, 466 U.S. 648 (1984). Obviously, Mr. Silva was motivated to lie during jury trial allowed by the government with a significant bonus. Mr. Silva was facing charges against him that could have rendered him a sentence of more than 20-years in prison. Charges were dismissed in exchange for his lies. Indeed, a person facing more than 20-years will do anything if allowed by the government to avoid spending more than two decades in prison. This was not the exception.

## 2. Arturo Garcia's false testimony.

In the prosecution of Samuel Velasco, star Arturo Garcia was a critical witness in the government's part in establishing guilt. Arturo Garcia was Alan Garcia's father. According to the government, Alan Garcia was a hit man working under the command of Samuel Velasco. Alan Garcia however, on Apil 22, 2009 was murdered during the commission of a kidnapping in Juarez Mexico. According to the government's theory in Velasco's case, Alan Garcia's role in this case was the person that planned and executed the commission of the murders of Cinthia Sagredo, Ruth Sagredo Escobedo, Roberto Martinez and Ruth's father Francisco Sagredo on November 22, 2008 in Juarez Mexico. According to the record of this case, Alan Garcia acted in joint of two other hit man names Ruben Alejandro Garcia Valdiviezo (Homie) and Luis Nieves Ochoa (Chino). Arturo Garcia testified that Gurrola offered to pay Alan for murdering Ruth, in part, by funneling Alan lucrative kidnapping opportunities.

Strangely, Arturo Garcia testified during trial of his son's illegal activities including; that he kidnapped people and stole trucks and killed people. See Tt. Vol 2. Pg. 18. Ln 6. However, when accounting the motive for this, the history of this case revealed that Arturo Garcia had been prosecuted in the Western District of Texas, El Paso Division previously on or around 2011, and was serving near a 20-year federal sentence. In exchange for his cooperation, or even better, to fulfill the gaps of the government in this case in exchange, he was to walk a free man if participated and

corroborated what the government needed to be exposed during trial, even if that meant not stating the truth under oath in a federal court to the jury. Arturo Garcia is an ex-convict with sufficient experience when it comes to the benefits that a person assisting the government can obtain. Arturo Garcia's criminal record reveals that he is an artist when it comes to testifying. He was not new at lying for government officials. The record reveals that he has assisted government officials in the past in the prosecution of other criminals.

Q. Now, Mr. Garcia, you were arrested back in 2011; is that

correct?

A. Yes, sir.

Q. And at that time did you have the opportunity to sit down

and talk to agents?

A. Yes, sir.

Q. And back in 2011, did you tell the agents regarding Samuel Velasco and the kidnappings of his wife and the murder of his wife and his ex- – or his in-laws?


BY MR. GIBSON:

Q. And back in 2011 did you agree to testify against

Mr. Samuel Velasco?

A. No, not at that time.

Q. And at that time did you plead guilty to your cocaine and

heroin charges without a plea agreement, without any benefit

from the Government?

A. Yes, sir.

Q. And yet you're here testifying today?

A. Yes, sir.                    **Tt. Vol 2. Pg. 65.**


11

It was clear in this case that the only reason why Arturo Garcia was testifying in Samuel Velasco's case, was because he was to walk away from the crimes he had been convicted in 2011, plus the government had offered him immunity. **See Trial Exhibit 157.**

Arturo Garcia testified about the childhood of his son, as well as that his son Alan Garcia was a good friend of Emmanuel Velasco, Samuel Velasco's brother. According to Garcia, during one of the encounters with Samuel Velasco, he exposed to him at Horizon Boulevard of an illegal or criminal proposition. According to Garcia, Samuel had told him that he was looking for someone to kill his ex-wife Ruth Sagredo because She was accusing him of raping her four-year-old daughter and that he had some concerns about his wife potentially testifying against him during trial at state court. (Tt. Pg 27. Ln 20-21).

Garcia testified that during a second encounter he joint his son Alan Garcia to a house in Thunder Ridge at Dalia Valencia house (See Exhibit 143) (Samuel Velasco's Sister) where Samuel, Emmanuel, and Dalia were present. There, Samuel and Alan Garcia engaged in a conversation where Samuel proposed to Alan of the killing of Francisco Sagredo. In addition, Garcia testifies that he overheard of the existence of a safe containing more than $200, 000 Dls in cash at Francisco Sagredos' house. According to Garcia's testimony of what he overheard, the plan was to kill Ruth's father in Juarez so Ruth could go to Juarez and they would be able to kill Ruth in Juárez during the assistance of her dad's funeral. (Tt. Pg.34 Ln. 10-12).

During this reunion according to Garcia the discussion was about planning the murder of Francisco Sagredo, and about a safe containing approximately $200,000 in currency in it, money that was to be kept at the culmination of the mission by Alan Garcia (his son).


THE WITNESS: Yes, sir. They were planning at his

sister's house. They were planning to kill and they were

planning a burglary at the father-in-law's house. **Tt. Vol. 2. Pg. 30.**

BY MR. GIBSON:

Q. And who was doing most of the talking during this conversation?

A. Samuel.

Q. And did Samuel have a proposition for your son Alan?

A. Yes, sir. **Tt. Vol. 2. Pg. 32.**


THE WITNESS: The house was in Ciudad Juárez, Mexico.

BY MR. GIBSON:

Q. Now, does there come a point where they talk about where they want to kill – where Samuel Velasco wants his wife murdered?

A. Yes. They wanted to kill the man so Ruth would go to Juárez and they would be able to kill Ruth in Juárez.

Q. Did Samuel Velasco say where in Juárez he wanted Ruth killed?

A. Yes. He wanted her killed at a funeral home.

Q. Did Samuel Velasco say if he wanted particular family members to watch the murder? **Tt. Vol 2. Pg. 34.**


According to Garcia's testimony, Samuel not only paid some money to Alan, but commented that he had other missions for him, or other kidnappings that he was willing to achieve in the city of Juarez.


Q. And did you see anything exchanged at this meeting?

13

A. Yes. I saw that he gave him a wad of money.

Q. Who gave who a wad of money?

A. Samuel to Alan.

Q. Now does your son Alan, does he accept this – this

murder-for-hire scheme? Did he agree to do it?

A. Yes. He took the money.

Q. And how long did this entire conversation there at the

Thunder Ridge address take?

A . About 20 minutes.  **Tt. Vol 2. Pg. 37.**


Decisive was the fact that according to the rental records of the described house belonging to Dalia Valencia, (Samule Velasco's sister), where as alleged by government witness Garcia, the Velasco's brothers encountered with him and his son Alan Garcia to plan the murder of Francisco Sagredo, was rented to a Real State agent named Juan Larios and neither Dalia the alleged owner of property or any of the Velasco's brothers had access to the house. Then yet, trial counsel turned a blind eye in investigating and presenting substantial evidence to disprove Garcia's lies. Because Garica's testimony about the encounter at Dalia's house was critical to the case, the existence of rental contracts and the same renter could have disproved Garcias lies. Attorney could have pursued challenging Garcia's lies by investigating and gathering substantial evidence that  without any doubt could have changed the outcome of the proceedings. Indeed, if attorney had presented this evidence, no conviction could have been rendered against Samuel Velasco.  **Rental Contract of House in Thunder Ridge is to be amended to this Motion. Affidavits from from witnesses are to be amended to this Motion.**

In accounting the plain language of 18 U.S.C Section 956 and 1958 (Conspiracy), according to Garcia's own testimony he not only overheard the planning of the murders, but participated by providing his vehicle so the money recovered at Francisco Sagredo's house be transported into the United States.

Q. And again, I'm going to ask you yes or no.

As a result of this conversation, did you agree to do something illegal and help your son Alan reference this scheme we've been talking about?

A. Yes, sir.

Q. And what did you agree to help Alan do?

A. To let him have my vehicle.

Q. To do what?

A. To transport the money to the United States.

Q. And what was the source of this money?

A. From the burglary, from the safe.   Tt. Vol 2. Pg 38.


Very convenient for the government was the fact that he can charge whoever whenever without questions asked. Here, if Garcia's testimony was in fact truth the way it was presented by the government, then without a doubt Garcia helped with the planning and provided aid in transporting the money obtained from the alleged safe located at Francisco Sagredo's home during his killing. However, because the government was fully aware that Garcia was not telling the truth, and that everything was only part of a master plan to present his criminal case to the jury, as long as Garcia obeyed his command he could lie as long as he implicated and contaminated Gurrola's case. In this case no one cared much about the Fifth Amendment rights, or about all man similarly situated must be treated equally. As long as the government gets what it wants. In this case the goal was to obtain a conviction at all cost, even based on lies.

According to witness Garcia, his son Alan was killed on April 22, 2009, at that time Garcia was in North Carolina and immediately called his son's wife Ana Rosa Quezada. Garcia then instructed her to go talk to Samuel Gurrola at a shoe store on Loop 375, a shopping center pertaining to the Gurrola's family. According to Garcia's testimony, the Velasco (Gurrola's family) paid for his flight from North

Carolina to El Paso Texas in other for him to attend his son's funeral. Specifically, Dalia had paid for the trip. **Tt. Vol. 2. Pg 57.** No record reflects that Dalia Valencia paid for the flight, no objection contradicting the same was ever pursued by Gurrola's attorney.

Q. Now, Mr. Garcia, when you were in North Carolina trying to

figure out whether or not Alan had been murdered, did you give

any instructions to Ms. Ana Rosa Quezada, this lady in 106?

Did you give her any instructions on a place to go and someone to ask about Alan?

THE WITNESS: Yes, sir.

BY MR. GIBSON:

Q. And where did you tell Ana Rosa to go?

A. I told her to go to Samuel's shoe store to see if they

could give her a phone number for Emmanuel, Emmanuel's phone

Q. And did you tell her who to talk to there at the shoe

store?

A. Yes, sir.

Q. And who did you tell her to talk to?

MR. BENJAMIN: Objection, Your Honor, hearsay. Not in

furtherance of. Hearsay, not in furtherance of, Your Honor.

THE COURT: Overruled.

THE WITNESS: Yes, I told her to speak to Samuel.

Very contradicting is the fact that Ms. Ana Rosa Quezada has been in contact with the Gurrola's family prior to the trial of Samuel and was willing to testify during his the same. But most important is the fact that trial attorney was informed of this and

failed to bring her as an alibi witness. Ms. Quesada has been in contact with Samuel Gurrola and has corroborated that she is willing to disprove what the government has presentd during trial. First, because she more than anybody knew how, and the modus Alan Garcia was involved in criminal activities with the Mexican drug Cartels. According to Ms. Quesada at no time she received instructions from Garcia to visit Samuel Gurrola at no shoe store at any time during or after Alan Garcia was killed; and Second, her desire was to testify during trial about Francisco Sagredo's activities prior to his killing and possible motive. Also, that he was not near a person of good character the way the government made it seemed. According to Ms. Quesada, Francisco Sagredo was killed because he refused to pay the monthly protection quote to one of the cartels for which Alan Garcia worked in Juarez. Francisco Sagredo had previously received many threats from the Cartels because his business was not paying the protective monetary quote. Also, Francisco Sagredo was well known for having enemies based on the fact that he had a bad habit of bring workers from south of Mexico to work in his business without paying them. **Affidavit of Ana Rosa Quezada is to be Amended to this Motion.**

According to Garcia after his son Alan was killed, he maintained visiting Samuel Velasco at the shoe stand location. According to Garcia in several occasions Samuel Velasco asked him if he wanted to kidnap people for pay.


Q. Now after your son Alan's death, did you maintain contact

with the Velasco family?

A. Yes, sir.

Q. And specifically, did you maintain contact with Samuel

Velasco, the Defendant?

A. Yes, sir.

THE WITNESS: On some occasion he asked me if I wanted

to kidnap people so I could relieve myself with money.


Q. Did Mr. Samuel Velasco, the Defendant, ever recount to you

the events of the murders of his in-laws and wife in Mexico
there at the shoe store?    **Tt. Vol 2. Pg 58.**


A. Oh, he was – talked to me how things had happened, how
they killed the father-in-law and Ruth's sister.

Q. And did the Defendant admit that he was involved, and did
he hire these people to do it?

   A. Yes, sir.    **Tt. Vol 2. Pg 59.**


It is very convenient to lie in a stand in front of a jury when you are provided
immunity for not being honest, walking free from a 20-year sentence in a mayor
incentive, it will be hard to pass the opportunity. Garcia was not the exception,
Garcia never had any encounter with Samuel Velasco, and his testimony was only
orchestrated by the government to obtain Velasco's conviction. That course respects
our adversarial system. This is only a prudential convenience of our adversarial
system from the inquisitorial of one. The typical promotion of unfairness to a
defendant with the finality of obtaining conviction, especially true when one side is
represented by a trained, sophisticated lawyer employed by the federal government,
the richest, most powerful, and best represented litigant to appear in court and the
other side is a manipulated attorney pretending to render fair representation to a
blind defendant.


### 3.  Ruben Alejandro Garcia Valdiviezo (aka Homie) and Luis Nieves Ochoa (aka Chino).

Homie and Chino are two individuals essentially known better as Ruben Alejandro
Garcia Valdiviezo for Chino, and Luis Nieves-Ochoa for Homie. Both of this
individual. According to the record of the present case, both of these individuals
worked under the command of Alan Garcia and participated in the multiple
kidnappings in Juarez Mexico, and multiple murders in the same city under Alan

Garcia's command.

Obviously, because Homie and Chino worked instructed by Alan Garcia, they also worked for Samuel Velasco considering the chain of command as presented by the government through government witness Arturo Garcia among other evidence. Homie and Chino, in joint of Alan Garcia were direct participants in the killing of Francisco Sagredo, Cinthia Sagredo, Ruth Sagredo and Roberto Martinez. Alan Garcia was killed on April of 2009. Homie and Chino are serving a 20-year federal sentence in a Mexican prison for kidnappings that took place in Juarez Mexico.

According to the Government, there was a lot of kidknappings that Samuel Velasco (Velasco) committed through Alan, Chino, and Homie, ranging from 2008, 2009 and all the way to 2012, however, the government as an act of compassion only limited the kidnappings the he introduced only until when Alan Garcia died.

The government was on notice that it was Homie, Chino and Alan Garcia the participants of the multiple kidnappings and murders Francisco Sagredo, Cinthia Sagredo, and Ruth Sagredo, the same government was on notice that Homie and Chino were part of Alan Garcia's hit team. In fact, it was the same government who admitted during trial that he personally interviewed both of those individuals.

When the government was asked if Homie and Chino were being extradited to face the murder of Francisco Sagredo, Ruth Sagredo and Cinthia Sagredo, the government confirmed during trial that the United States was not looking to extradite those individuals. Contradicting when accounting that all man are to be treated equally, since Alan Garica, Chino and Homie according to the government were part of this case, and mayor participants.


Q. What was Alan Garcia's central role in these murders?

A. Alan Garcia was part of who planned it, and he was a hit

man.

Q. Okay. Was – what was his level of involvement? Was he in

charge? Was he, you know, not in change?

A. He was in charge of the hit team.

**(Motion Hearing of October 5, 2016 Pg. 27)**

**BY MR. BENJAMIN:**

Q. Briefly, Agent, to pick up on the Government's last
question.
Homie and Chino are two individuals essentially known
better as Ruben Alejandro Garcia Valdiviezo for Chino, and Luis
Nieves-Ochoa for Homie, correct?
A. Correct.
Q. And you've sat down with both of those individuals,
correct?
A. Yes, I have.

Q. Both of those individuals were part of Alan Garcia's

alleged hit team, correct?

A. Correct.

Q. Okay. And both of those individuals have denied this,

correct?

A. Correct.

THE COURT: Have they been charged?

MS. NEWAZ: They're in federal prison in Mexico

serving 20-year sentences for participation in kidnappings,

MS. NEWAZ: I am currently not trying to extradite

those individuals.

### (Motion Hearing of October 5, 2016 Pg. 28)

The operative question to be presented to this court is, why the government upon notice that Homie and Chino were mayor participants in this case made no attempt in extraditing then to face the murders in the United States?

The answer was uncovered not too long ago. Mexican Attorney Delfina Franco out of Juarez Mexico, conducted an investigation in respect to Homie and Chino while both are serving Mexican sentences in a federal prison. During an interview to Ruben Alejandro Garcia Valdiviezo and Luis Nieves Ochoa, many of the omitted by the government facts came to light. First, the admitted of being part of a hit team in Juarez Mexico, and indeed admitted committing many kidnappings in Juarez. But also confessed that thay worked under the command of a Mexican Cartel, and not as the government made it appear in this case during the trial of Samuel Velasco-Gurrola. They in fact admitted knowing Alan Garcia, and that Alan Garcia workedfor the same Mexican Cartel and had participated in many kidnappings in Juarez, however not under Samuel Velasco-Gurrola's orders but under the Mexican Cartel. Homie and Chino stated that an encounter with United States authorities took place, and that they were questioned about Samuel Velasco-Gurrola and his brother Emmanuel Velasco Gurrola. They made the government officials aware that they had no connection with neither of the Velasco brothers, and that the motive of Francisco Sagredo's was beyond the case built against the Velasco brothers and for Francisco Sagredo failing to participate in the protective quote that all businesses in Juarez are to pay. According to Nomie and Chino, Francisco Sagredo had been warned in more than several occasions and he refused to participate with the Cartel's orders. Main reason why he was killed. Ruben Alejandro Garcia Valdeviezo and Luis Nieves Ocho, are willing to provide affidavits in support of the above mentioned. **Affidavits are to be Amended to this Motion.**

The government was no estranger to the truth of Samuel Velasco-Gurrola's case, and most important the government was fully aware that by extraditing Homie and Chino both of them would ruin its criminal case against the Velasco brothers. Main reason why the government opted for not pursuing extradition against both of this individua Velasco's trial attorney could haved traveled to the federal prison in Juarez where Homie and Chino were kept, and easily questioned both of this individuals same way Mexican Attorney Delfina Franco did. If trial attorney had pursued this way of challenging Velasco's case, the outcome of the proceedings definitely would have differed from conviction.

### 4. Dalia Valencia's Car Rental Records.

At trial, Arturo Garcia testified that the Velasco family often used rental cars to further their kidnapping pursuits. Arturo also testified that Velasco and his cohorts used rental cars to conduct surveillance of the murder victims and to watch at least one of the murders. The Government then introduced rental car records, which indicated that Dalia Velasco frequently rented cars.

According to government witness Arturo Valencia's testimony, Samuel Velasco Gurrola's sister, Dalia Valencia was a mayor participant in this case. Her role was to rent cars so the hit man could used then in Juarez for different purposes in the commission of many kidnappings and most important in the Killing of Francisco Sagredo.

Q. And did Arturo Garcia tell you that Dalia Valencia did

anything in order to obtain equipment or other items for use by

the kidnapping team?

A. Yes. Dalia was to rent vehicles in order – for the hit

team to use, either for surveillance or to carry out the

murders in Mexico.

**(Motion Hearing of October 5, 2016) (Pg 18)**

According to government Exhibit 37, showed a rental agreement of a particular vehicle by Dalia Valencia according to Arturo Garcia's testimony and the investigation of Samuel Velasco for these murders, Exhibit 37 corroborated what Arturo Garcia had told the government with regard to Dalia Valencia renting a vehicle for use in the murders.

According to the the government, a vehicle Silver Pontiac was rented at Avis Rental Car Company the day before the murder on October 2, 2008 and it was returned the day of the murder on October 3, 2008. And it was a silver – silver APC. **(Mot. Hearing of Act. 5, 2016 Pg. 20)** According to the government's theory of the case, vehicle was used either for surveillance or to carry out the murders.

Trial counsel failed to conduct its own investigation respecting car rental agreements, credit cards records of Dalia Valencia, Port of Entry records to disprove that the testimony of nothing but lies in pursuing Samuel Velasco's conviction.

In the United States no one can rent a car without a credit cart on hand. The record of a credit card may reveal when and at what time the credit card was used. In this case, Dalia Valencia's credit cards reveal that in fact she indeed rented a car during the tame when the murders were committed, but not on the October the 2th, neither car was returned on October the 3rd as the government presented during trial. **Credit Card Records are to be Amended to this Motion.**

Also, Port of Entry Immigration records could have revealed that such a vehicle record of departure and entrance back to the United States does not concede to the evidence presented during trial.

Samuel Velasco's trial counsel render ineffective assistance by not presenting imminent records to disprove the testimony of witness Garcia, and most important to contradict the government's theory in this case. If attorney has presented this evidence, the outcome of the proceedings could have been different. In this case, many points where government acted contrary to the mandates of constitutional rights could have ben avoided but for trial counsel's ineffectiveness.

## COMULATIVE EFFECT OF INEFECTIVE ASSISTANCE OF COUNSEL

Velasco-Gurrola claims ineffective assistance of counsel based on the cumulative effect of deficient performance by his defense counsel under the above-mentioned facts and cumulative errors made by his counsel. The Supreme Court has held that in the context of a claim of ineffective assistance of counsel, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." United States v. Cronic, 466 U.S. 648, 659 n. 26 (1984).

Here but for counsel errors in pursuing, investigating, and challenging government's evidence as described above, the outcome of Velasco-Gurrola could have been different. Trial counsel could have undermined government's witness's reliability and the outcome could have been different.

Velasco should prevail based on the cumulative counsel errors as he allowed the government to act outside the scope of a partial and just prosecution in violation of the Fifth and Sixth Amendment to the Constitution.

## STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

The United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). A showing of ineffective assistance of counsel requires that (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. Counsel's deficient performance must be determined by showing that "counsel's representation fell below an objective standard of reasonableness." Id. at 688. To prove prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. A court need not address both parts of an ineffective assistance of counsel claim if the defendant fails to make a sufficient showing of one part of the Strickland test. "Failure to meet either the deficient performance prong or the prejudice prong will defeat a claim for ineffective assistance of counsel." Id. at 700.

For the purposes of federal habeas review, scrutiny of counsel's performance "must be highly deferential." Id. at 689. A court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." <u>Ray v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999). Furthermore, "[a] fair assessment of [counsel's] performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Furthermore, the Fifth Circuit has explained that, "[a] conscious and informed division on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." <u>Martinez v. Dretke</u>, 404 F.3d 878, 885 (5th Cir. 2005)(quoting

24

United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002)).

## V. CONCLUSION

For the foregoing reasons, this Court should vacate Velasco-Gurrola's sentence and conviction and grant relief as this court deem appropriate under the circumstances of the case.

Executed and Signed this 29 day of October, 2019

Respectfully Submitted

_Samuel Velasco Gurrola_

Samuel Velasco-Gurrola
Reg No. 51956-380
USP CANAAN
U.S. PENITENTIARY
P.O. BOX 300
WAYMART, PA 18472

## CERTIFICATE OF SERVICE

I, Samuel Velasco-Gurrola, hereby certify that I have served a true and correct copy of the following Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C 2255 by a Person in Federal Custody to the United States District Attorney's Office of the Western District of Texas, El Paso Division, and deposited same in the United States mailing system at the United States Penitentiary, Canaan on this 29 day of October, 2019.

Respectfully Submitted

Samuel Velasco Gurrola

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

SAMUEL VELASCO-GURROLA,   )

    Petitioner,   )

                )   **MEMORANDUM OF LAW**

    Vs.   )

                )   **Crim No. 3:15-CR-01646-DB**

UNITED STATES OF AMERICA  )

    Respondent.   )

F I L E D

NOV 0 4 2019

CLERK
WESTERN ... CLERK
BY ... OF TEXAS
DEPUTY

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY PURSUANT TO 28 U.S.C 2255.

--------------------------------------------------------------------------

    Samuel Velasco-Gurrola ("Velasco"), hereby acting Pro se, respectfully moves to vacate, Set Aside, or Correct his sentence pursuant to the present 28 U.S.C 2255 motion. Petitioner respectfully requests that this Honorable Court make the proper findings and provide relief from a conviction and sentence that was imposed herein in violation to the United States constitution and laws of the United States. Attached to this Motion petitioner presents Memorandum of Points and Authorities in support. In addition, Vazquez attached a Declaration by Samuel Velasco Gurrola in support of the arguments presented throughout the present petition.

# I. JURISDICTION

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law. Or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside of correct the sentence. Id. *28 U.S.C 2255.* See *Davis v. United States, 417 U.S. 333, 343, 94 S.Ct. 2298, 2304, 41 L.Ed.2d 109 (1974); United States v. Placente, 81 F.3d 555, 558 (5th Cir. 1996).*

# II. TIMELINESS

In relevant part the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA") as contained *in 28 U.S.C 2255,* paragraph 6, provides that:

A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

(a). the date on which the judgment of conviction became final.

Velasco's direct appeal was denied on August 2, 2018. Vazquez's shall have until August 2, 2019 to file his timely habeas corpus petition. Additional 90-days shall be added pursuant to de mandates of *Clay v. United States, 537 U.S. 522 (2003),* because Velasco did not file for writ of certiorari in the Supreme Court of the United States.

# II. STATEMENT OF THE CASE

On September 22, 2015, federal warrants were issued for several VCE members, including Samuel Velasco Gurrola. He was arrested the next day in El Paso and later charged in a seven-count First Superseding Indictment for three counts of conspiracy to kill in a foreign country under 18 U.S.C. § 956(a) and four counts of conspiracy to cause travel in foreign commerce in the commission of murder-for-hire under 18 U.S.C. § 1958(a).

At the week-long trial, the Government produced nearly twenty witnesses, but none more important than Arturo Garcia. Arturo testified extensively to conversations he both participated in and overheard in which Samuel Velasco Gurrola, Alan Garcia, and others devised a plan to kill Ruth and her family. Arturo Garcia further testified that, after Ruth Sagredo's murder, Velasco-Gurrola admitted to the murders of Francisco Sagredo, Cinthia Sagredo and Ruth Sagredo and her then boyfriend.

## VI. ARGUMENTS PRESENTED FOR REVIEW

### A. WHETHER COUNSEL RENDERED INEFFECTIVE ASSITANCE BY NOT MOVING TO DISMISS COUNT 4,5,6, AND 7 OF THE INDICTMENT BASED ON THE EXTRATERRITORIAL APPLICATION OF SECTION 1958(a).

Samuel Velasco Gurrola was charged and convicted of (4) Four Counts of Conspiracy to Cause Travel a Foreign Commerce in the Commission of Murder-for-Hire in violation of 1 Title 18 U.S.C Section 1958. (See Counts 4,5,6 and 7 of Second Amended Judgment Doc. # 313). Velasco was sentenced to Life on each of the Four Counts to run consecutive to the rest of Counts as described in his indictment. Id.

Counts Four, Five, Six and Seven of the Indictment charge Velasco with committing and conspiring to commit murder for hire in violation of 18 U.S.C. section 1958(a). That statute, in relevant part, makes it a crime to "travel[] in or cause[] another . . . to travel in interstate or foreign commerce . . . with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C.S. § 1958(a).

Section 1958(a), by its plain terms, criminalizes not murder, but (1) interstate or foreign travel, (2) with the intent to commit a murder in violation of Federal or State law, (3) for pecuniary gain. See, e.g., United States v. Delpit, 94 F.3d 1134, 1149 (8th

Cir. 1996) ("[Section 1958] does not prohibit murder or attempted murder. Instead, it outlaws using interstate-commerce facilities with the intent that murder-for-hire be committed. Once the interstate-commerce facility is used with the required intent the crime is complete.").

Velasco presents that the Indictment represents an extraterritorial application of Section 1958(a) is unavailing, as the Indictment plainly charges him or whoever committed the murders with traveling in foreign commerce from within the United States to the Juarez, Mexico, thus not satisfying the objective element of the offense. Charging a defendant with a federal crime whose objective elements are satisfied by allegations of actions committed by the inside the United States is not an extraterritorial application of federal criminal law. Cf. United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (discussing the presumption against extraterritoriality as operating when an indictment concerns "conduct outside the territorial jurisdiction of the United States"). However, here, the plain language of the statute requires that either Velasco or members of the conspiracy traveled outside the United States to commit murder. The sufficiency of the evidence that they actually intended to commit murder at the time they departed from the United States are ones for the jury; at this stage, the Government's allegation concerning such intent was unsatisfied by any evidence.

The Indictment is nonetheless defective with respect to the crimes charged in Counts Four, Five, Six and Seven because it does not identify, or allege facts demonstrating that the murder in Juarez, Mexico violated, any provision of State or Federal law that prohibited the alleged murder, and thus does not sufficiently allege the mens rea element of the offenses charged in those Counts, which requires that Velasco intended to commit a murder that would violate Federal or State law.

Although, Velasco's crime is a conspiracy and not a substantive murder, Section 1958(a), by its plain terms, criminalizes not murder, but (1) interstate or foreign travel, (2) with the intent to commit a murder in violation of Federal or State. Which by its terms requires that either Velasco, or the people who committed the murder, or at the least the weapons utilized to cause the murder were part of violating interstate commerce.

Title18 U.S.C.S. § 2332 deals with substantial crimes ("Whoever kills a national of the United States, while such national is outside the United States . . . ."), however, here, the government came short from satisfying (1) That the victims where U.S.

4

Citizens or Nationals (2) that the people causing the substantial crime or Gurrola traveled outside the United States with the intent to commit the crime. Absent a Federal or State law criminalizing the murder of a non-United States national abroad under the circumstances alleged in the Indictment, the Government cannot establish intent to commit a murder in violation of Federal or State law, which is a necessary component of the mens rea element of Section 1958. Because there appears to be no such law, the Indictment fails to allege a violation of Section 1958. Accordingly, Count Four, Five, Six and Seven (Conspiracy to Commit Murder-for-Hire) of the Indictment must be dismissed.

Illustrating is <u>United States v. Samia</u>, 1:13-CR-521-LTS (Dist. Court, SD New York 2017). Samia was charged with Counts One and Two of the Indictment, violations of 18 U.S.C. section 1958(a), which requires, in relevant part, that Defendants have used a facility of interstate or foreign commerce "with intent that a murder be committed in violation of the laws of any State or the United States." The Indictment alleged that the Defendants traveled in foreign commerce in connection with the murder of Catherine Lee, a non-U.S. national, in the Phillippines. See Samia, 2016 WL

On August 19, 2016, Samias' co-defendant Stillwell moved, inter alia, to dismiss Counts One and Two of the Indictment. (Docket entry no. 345.) In his memorandum of law in support of the motion, Stillwell argued that Section 1958 should not be read to have extraterritorial effect (i.e, application in connection with a murder that allegedly took place outside of the United States). In the course of making that argument, which the motion characterized as a "jurisdictional" challenge, Stillwell noted that "[d]espite Section 1958's reference to a murder in violation of any of the laws of the United States, the Government has identified no other homicide statute to close this jurisdictional loophole." (Docket entry no. 346, Mem. of Law in Support of Motion to Dismiss, p. 13 n. 8.) Defendant Samia later joined the motion. In response, the Government asserted that the Indictment sufficiently alleged violations of Section 1958 because it alleged that Defendants possessed "the intent to commit a murder in violation of Section 956," which the Government described as "the object murder offense." (Docket entry no. 349, Mem. of Law in Opposition, p. 15.)

Gurrola urges that his circumstances clearly mirror those in Samia, and his trial attorney failed to move to dismiss the charges as alleged in his indictment. Because

the government came short from establishing that Velasco or any of the people involved in the commission of the murders in Juarez traveled interstate this case represents extraterritorial concerns; it is a matter of jurisdiction in which boundaries are being trespassed.

It is wort repeating that 1958(a), by its plain terms, criminalizes not murder, but (1) interstate or foreign travel, (2) with the intent to commit a murder in violation of Federal or State, and here the government came short in establishing interstate or foreign travel. Wherefore, thus court must remand with instructions that all charges pertaining to 18 U.S.C Section 1958(a) be dismissed. Additionally, because his trial attorney rendered ineffective assistance of counsel for not addressing this matter in a timely and proper manner.

## B. WHETHER COUNSEL RENDER INEFFECTIVE ASSITANCE BY NOT OBJECTING TO THE IMPARTIALITY DURING THE INTRODUCTION OF AN UNRELATED AND DISMISSED STATE CASE INVOLVING SEXUAL ASSAULT OF HIS EX-WIFE'S MINOR CHILD

The extructure of Velasco's case begins with Velasco marring Ruth Sagredo Escobedo ("Ruth"). A few months later, Ruth accused Velasco of sexually assaulting Ruth's five-year-old daughter and Ruth filing criminal charges against Velasco in the Texas State Court. The state filed charges against Velasco in 2005.

According to the theory of this case, after Velasco became aware that Ruth was going to testify as the "outcry" witness, Velasco began searching for a way to prevent Ruth from testifying. The theory of this case is that in May 2008, during a pretrial hearing, Velasco threatened Ruth if she did not drop the case. Accordingly, during the same event Velasco had pointed at Ruth's father (Fransico Villareal) and had stated that he "would start with him." According to the Government, it was the same Ruth who urged the prosecutor of the state and mentioned these facts.

However, this theory was part of prosecution's strategy in fulfilling the gaps in the criminal case, no substantial evidence was ever presented formally.

On October 3, 2008, a group of masked individuals invaded Francisco's home,

murder him and stole approximately $140,000 from his safe. According to the statement of Arturo Garcia (Government's witness) during a meeting with Emmanuel, Dalia, Alan Garcia at Dalia's residence in El Paso, Velasco had orchestrated the plan of murdering Ruth. Ruth and her then boyfriend, Roberto Martinez where ambushed and murder in Juarez while attending to Ruth's sister Cinthia's funeral.

On December 9, 2008, Velasco appeared ready to begin trial on the sexual assault charge. However, the State of Texas ultimately dismissed the case.

Velasco was arrested on September 23, 2015 under a federal warrant for conspiring to murder or cause the murder of Ruth, Francisco, Cinthia, and Roberto.

Because Velasco was not convicted of sexual assault charges in the state court, mentioning this fact at any event during his murder charges and process was highly contaminating and prejudicial, considering that it was a five-year-old child involved.

It is critical and worth clarifying that Velasco was not convicted of Sexual Assaulting nobody. Mentioning this matter to the jury or mentioning this matter in general was highly prejudicial and exposed the case to a different and negative perception to the jury and anyone that heard this matter. Velasco was charged with conspiracy to commit murder, mentioning the sexual assault was unnecessary and in bad faith in the government's part. The government could have proved its case by simply stating that Velasco conspired to murder individuals to prevent them to testify in an unrelated state case without giving mention that the case involved a sexual assault to a minor. This honorable court may concede that prejudice was eminent, that perception was key in determining culpability and that the strategy of the government was somewhat vindictive and with the sole purpose of putting Velasco in disadvantage.

The Sixth Amendment to the United States Constitution sets forth rights related to criminal prosecutions including the right to a public trial without unnecessary delay, the right to a lawyer, the right to an impartial jury.

Without a doubt impartiality was at all times a matter of concern here, even when the court could instruct the jury not to account the state sexual assault to a minor charge. It is illustrating and presumed that many of the jurors were father or mother of children allowing them to hear unrelated information violated Velasco's constitutional rights. **Id. Const. Sixth Amendment.**

The trial court had no legal right to strip Velasco from his constitutional rights. Constitutional rights may not be invoked partially or discriminatory. The equal protection provides that all people must be treated equal when similarly situated. The Equal Protection Clause of the Fifth and Fourteenth Amendment is essential a direction that all persons similarly situated be treated alike. See. <u>Cleburne v. Cleburne Living Center, Inc.</u>, 473 U.S 432 (1985).

Gurrola prays that this honorable court remand his case with instructions that he be retried his jury trial, without giving mention to the State Sexual Assault to a Minor information, because this information has no play in the federal court but constituted vindictiveness in the government's part. The mentioning of irrelevant facts was in bad faith, Velasco's case was highly prejudiced because such information was decisive in rendering partial decision, his attorney was ineffective by not properly raising this matter in a proper and timely manner.

Velasco should prevail under the above-mentioned argument.

### C. WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR NOT CHALLENGING PROSECUTORIAL MISCONDUCT DURING THE PRESENTATION OF EVIDENCE AGAINST SAMUEL GURROLA.

### 1. <u>Cesar Silva's false testimony.</u>

In the case at hand, key witness to the case of Samuel Velasco was government witness Cesar Silva. According to the record of government case, Silvas' role in presenting this case was that Emmanuel Velasco (Samuel Velasco' Brother) has told him around late 2008 or early 2009 about the murders. According to Silva, Emmanuel Velasco for recruitment purposes had told him "We Killed the wife (Ruth), so she would not testify at trial."

What Silva referred to, was that Emmanuel Velasco has confessed the him in joint of his brother Samuel Velasco had caused the murders of Cinthia Sagredo, Ruth

Sagredo Escobedo, Roberto Martinez and Ruth's father Francisco Sagredo on November 22, 2008 in Juarez Mexico. **Sec. Direct Examination of Silva.**

Because this testimony was taken as being the truth, and no timely abjection or motion to disqualify witness was ever made, Silvas' testimony was presented and without a doubt contaminated the jury's perception. Silva's testimony was highly prejudicial and decisive in rendering Samuel's conviction.

In rendering ineffective assistance, it is worth addressing that trial counsel failed to timely move to disprove Silva's testimony during direct examination, however, became aware of the error committed while cross examination. During Cross examination Mr. Benjamin attempts to cure his error by addressing facts not presented in direct. Mr. Benjamin first presents that witness Silva was indeed motivated to lie during trial because charges were being dismissed against him. Then he attempts to present that Silva had contradicted himself in multiple occasions.

BY MR. BENJAMIN:

Q. Part of your plea agreement that we looked at yesterday is

a dismissal of that pending charge, correct?

A. Yes, sir.

Q. And I asked you yesterday if you -- excuse me.

I asked you yesterday if, in May of 2015, you were

asked about the killing of Samuel Velasco's wife, and you said you didn't know about that, correct?

A. Correct.

Q. That you did not know about the killing of Samuel Velasco's

Wife, was what your statement was at that time.

A. Yes, sir.

Q. And then you were asked the same question a month later,

and you knew about the killing of Samuel Velasco's wife,

correct?        **See. Silva's Cross Tt. 5-6 Vol. 3 of 5**

9

The government allowed witness Silva to present non-existent evidence, lies to the jury during trial, without the minimum remorse. Velasco's trial counsel simply turned a blind eye to the fact that there is a time and an specific order during the proceedings to file and object to prejudicial evidence. It seems like Mr. Benjamin was not familiar with the trial or criminal proceedings. See United States v. Cronic, 466 U.S. 648 (1984). Obviously, Mr. Silva was motivated to lie during jury trial allowed by the government with a significant bonus. Mr. Silva was facing charges against him that could have rendered him a sentence of more than 20-years in prison. Charges were dismissed in exchange for his lies. Indeed, a person facing more than 20-years will do anything if allowed by the government to avoid spending more than two decades in prison. This was not the exception.

### 2. Arturo Garcia's false testimony.

In the prosecution of Samuel Velasco, star Arturo Garcia was a critical witness in the government's part in establishing guilt. Arturo Garcia was Alan Garcia's father. According to the government, Alan Garcia was a hit man working under the command of Samuel Velasco. Alan Garcia however, on Apil 22, 2009 was murdered during the commission of a kidnapping in Juarez Mexico. According to the government's theory in Velasco's case, Alan Garcia's role in this case was the person that planned and executed the commission of the murders of Cinthia Sagredo, Ruth Sagredo Escobedo, Roberto Martinez and Ruth's father Francisco Sagredo on November 22, 2008 in Juarez Mexico. According to the record of this case, Alan Garcia acted in joint of two other hit man names Ruben Alejandro Garcia Valdiviezo (Homie) and Luis Nieves Ochoa (Chino). Arturo Garcia testified that Gurrola offered to pay Alan for murdering Ruth, in part, by funneling Alan lucrative kidnapping opportunities.

Strangely, Arturo Garcia testified during trial of his son's illegal activities including; that he kidnapped people and stole trucks and killed people. See Tt. Vol 2. Pg. 18. Ln 6. However, when accounting the motive for this, the history of this case revealed that Arturo Garcia had been prosecuted in the Western District of Texas, El Paso Division previously on or around 2011, and was serving near a 20-year federal sentence. In exchange for his cooperation, or even better, to fulfill the gaps of the government in this case in exchange, he was to walk a free man if participated and

corroborated what the government needed to be exposed during trial, even if that meant not stating the truth under oath in a federal court to the jury. Arturo Garcia is an ex-convict with sufficient experience when it comes to the benefits that a person assisting the government can obtain. Arturo Garcia's criminal record reveals that he is an artist when it comes to testifying. He was not new at lying for government officials. The record reveals that he has assisted government officials in the past in the prosecution of other criminals.

Q. Now, Mr. Garcia, you were arrested back in 2011; is that

correct?

A. Yes, sir.

Q. And at that time did you have the opportunity to sit down

and talk to agents?

A. Yes, sir.

Q. And back in 2011, did you tell the agents regarding Samuel Velasco and the kidnappings of his wife and the murder of his wife and his ex- – or his in-laws?


BY MR. GIBSON:

Q. And back in 2011 did you agree to testify against

Mr. Samuel Velasco?

A. No, not at that time.

Q. And at that time did you plead guilty to your cocaine and

heroin charges without a plea agreement, without any benefit

from the Government?

A. Yes, sir.

Q. And yet you're here testifying today?

A. Yes, sir.                              **Tt. Vol 2. Pg. 65.**

11

It was clear in this case that the only reason why Arturo Garcia was testifying in Samuel Velasco's case, was because he was to walk away from the crimes he had been convicted in 2011, plus the government had offered him immunity. **See Trial Exhibit 157.**

Arturo Garcia testified about the childhood of his son, as well as that his son Alan Garcia was a good friend of Emmanuel Velasco, Samuel Velasco's brother. According to Garcia, during one of the encounters with Samuel Velasco, he exposed to him at Horizon Boulevard of an illegal or criminal proposition. According to Garcia, Samuel had told him that he was looking for someone to kill his ex-wife Ruth Sagredo because She was accusing him of raping her four-year-old daughter and that he had some concerns about his wife potentially testifying against him during trial at state court. (Tt. Pg 27. Ln 20-21).

Garcia testified that during a second encounter he joint his son Alan Garcia to a house in Thunder Ridge at Dalia Valencia house (See Exhibit 143) (Samuel Velasco's Sister) where Samuel, Emmanuel, and Dalia were present. There, Samuel and Alan Garcia engaged in a conversation where Samuel proposed to Alan of the killing of Francisco Sagredo. In addition, Garcia testifies that he overheard of the existence of a safe containing more than $200, 000 Dls in cash at Francisco Sagredos' house. According to Garcia's testimony of what he overheard, the plan was to kill Ruth's father in Juarez so Ruth could go to Juarez and they would be able to kill Ruth in Juárez during the assistance of her dad's funeral. (Tt. Pg.34 Ln. 10-12).

During this reunion according to Garcia the discussion was about planning the murder of Francisco Sagredo, and about a safe containing approximately $200,000 in currency in it, money that was to be kept at the culmination of the mission by Alan Garcia (his son).


THE WITNESS: Yes, sir. They were planning at his

sister's house. They were planning to kill and they were

planning a burglary at the father-in-law's house. **Tt. Vol. 2. Pg. 30.**

BY MR. GIBSON:

Q. And who was doing most of the talking during this conversation?

A. Samuel.

Q. And did Samuel have a proposition for your son Alan?

A. Yes, sir. **Tt. Vol. 2. Pg. 32.**


THE WITNESS: The house was in Ciudad Juárez, Mexico.

BY MR. GIBSON:

Q. Now, does there come a point where they talk about where they want to kill – where Samuel Velasco wants his wife murdered?

A. Yes. They wanted to kill the man so Ruth would go to Juárez and they would be able to kill Ruth in Juárez.

Q. Did Samuel Velasco say where in Juárez he wanted Ruth killed?

A. Yes. He wanted her killed at a funeral home.

Q. Did Samuel Velasco say if he wanted particular family members to watch the murder? **Tt. Vol 2. Pg. 34.**


According to Garcia's testimony, Samuel not only paid some money to Alan, but commented that he had other missions for him, or other kidnappings that he was willing to achieve in the city of Juarez.


Q. And did you see anything exchanged at this meeting?

13

A. Yes. I saw that he gave him a wad of money.

Q. Who gave who a wad of money?

A. Samuel to Alan.

Q. Now does your son Alan, does he accept this – this murder-for-hire scheme? Did he agree to do it?

A. Yes. He took the money.

Q. And how long did this entire conversation there at the Thunder Ridge address take?

A . About 20 minutes.  **Tt. Vol 2. Pg. 37.**


Decisive was the fact that according to the rental records of the described house belonging to Dalia Valencia, (Samule Velasco's sister), where as alleged by government witness Garcia, the Velasco's brothers encountered with him and his son Alan Garcia to plan the murder of Francisco Sagredo, was rented to a Real State agent named Juan Larios and neither Dalia the alleged owner of property or any of the Velasco's brothers had access to the house. Then yet, trial counsel turned a blind eye in investigating and presenting substantial evidence to disprove Garcia's lies. Because Garica's testimony about the encounter at Dalia's house was critical to the case, the existence of rental contracts and the same renter could have disproved Garcias lies. Attorney could have pursued challenging Garcia's lies by investigating and gathering substantial evidence that  without any doubt could have changed the outcome of the proceedings. Indeed, if attorney had presented this evidence, no conviction could have been rendered against Samuel Velasco. **Rental Contract of House in Thunder Ridge is to be amended to this Motion. Affidavits from from witnesses are to be amended to this Motion.**

In accounting the plain language of 18 U.S.C Section 956 and 1958 (Conspiracy), according to Garcia's own testimony he not only overheard the planning of the murders, but participated by providing his vehicle so the money recovered at Francisco Sagredo's house be transported into the United States.

14

Q. And again, I'm going to ask you yes or no.

As a result of this conversation, did you agree to do

something illegal and help your son Alan reference this scheme

we've been talking about?

A. Yes, sir.

Q. And what did you agree to help Alan do?

A. To let him have my vehicle.

Q. To do what?

A. To transport the money to the United States.

Q. And what was the source of this money?

A. From the burglary, from the safe.  **Tt. Vol 2. Pg 38.**


Very convenient for the government was the fact that he can charge whoever whenever without questions asked. Here, if Garcia's testimony was in fact truth the way it was presented by the government, then without a doubt Garcia helped with the planning and provided aid in transporting the money obtained from the alleged safe located at Francisco Sagredo's home during his killing. However, because the government was fully aware that Garcia was not telling the truth, and that everything was only part of a master plan to present his criminal case to the jury, as long as Garcia obeyed his command he could lie as long as he implicated and contaminated Gurrola's case. In this case no one cared much about the Fifth Amendment rights, or about all man similarly situated must be treated equally. As long as the government gets what it wants. In this case the goal was to obtain a conviction at all cost, even based on lies.

According to witness Garcia, his son Alan was killed on April 22, 2009, at that time Garcia was in North Carolina and immediately called his son's wife Ana Rosa Quezada. Garcia then instructed her to go talk to Samuel Gurrola at a shoe store on Loop 375, a shopping center pertaining to the Gurrola's family. According to Garcia's testimony, the Velasco (Gurrola's family) paid for his flight from North

15

Carolina to El Paso Texas in other for him to attend his son's funeral. Specifically, Dalia had paid for the trip. **Tt. Vol. 2. Pg 57.** No record reflects that Dalia Valencia paid for the flight, no objection contradicting the same was ever pursued by Gurrola's attorney.

Q. Now, Mr. Garcia, when you were in North Carolina trying to

figure out whether or not Alan had been murdered, did you give

any instructions to Ms. Ana Rosa Quezada, this lady in 106?

Did you give her any instructions on a place to go and someone to ask about Alan?

THE WITNESS: Yes, sir.

BY MR. GIBSON:

Q. And where did you tell Ana Rosa to go?

A. I told her to go to Samuel's shoe store to see if they

could give her a phone number for Emmanuel, Emmanuel's phone

Q. And did you tell her who to talk to there at the shoe

store?

A. Yes, sir.

Q. And who did you tell her to talk to?

MR. BENJAMIN: Objection, Your Honor, hearsay. Not in

furtherance of. Hearsay, not in furtherance of, Your Honor.

THE COURT: Overruled.

THE WITNESS: Yes, I told her to speak to Samuel.

Very contradicting is the fact that Ms. Ana Rosa Quezada has been in contact with the Gurrola's family prior to the trial of Samuel and was willing to testify during his the same. But most important is the fact that trial attorney was informed of this and

failed to bring her as an alibi witness. Ms. Quesada has been in contact with Samuel Gurrola and has corroborated that she is willing to disprove what the government has presentd during trial. First, because she more than anybody knew how, and the modus Alan Garcia was involved in criminal activities with the Mexican drug Cartels. According to Ms. Quesada at no time she received instructions from Garcia to visit Samuel Gurrola at no shoe store at any time during or after Alan Garcia was killed; and Second, her desire was to testify during trial about Francisco Sagredo's activities prior to his killing and possible motive. Also, that he was not near a person of good character the way the government made it seemed. According to Ms. Quesada, Francisco Sagredo was killed because he refused to pay the monthly protection quote to one of the cartels for which Alan Garcia worked in Juarez. Francisco Sagredo had previously received many threats from the Cartels because his business was not paying the protective monetary quote. Also, Francisco Sagredo was well known for having enemies based on the fact that he had a bad habit of bring workers from south of Mexico to work in his business without paying them. **Affidavit of Ana Rosa Quezada is to be Amended to this Motion.**

According to Garcia after his son Alan was killed, he maintained visiting Samuel Velasco at the shoe stand location. According to Garcia in several occasions Samuel Velasco asked him if he wanted to kidnap people for pay.


Q. Now after your son Alan's death, did you maintain contact

   with the Velasco family?

A. Yes, sir.

Q. And specifically, did you maintain contact with Samuel

Velasco, the Defendant?

A. Yes, sir.

 THE WITNESS: On some occasion he asked me if I wanted

to kidnap people so I could relieve myself with money.


Q. Did Mr. Samuel Velasco, the Defendant, ever recount to you

17

the events of the murders of his in-laws and wife in Mexico there at the shoe store?   **Tt. Vol 2. Pg 58.**

A. Oh, he was – talked to me how things had happened, how they killed the father-in-law and Ruth's sister.

Q. And did the Defendant admit that he was involved, and did he hire these people to do it?

A. Yes, sir.   **Tt. Vol 2. Pg 59.**

It is very convenient to lie in a stand in front of a jury when you are provided immunity for not being honest, walking free from a 20-year sentence in a mayor incentive, it will be hard to pass the opportunity. Garcia was not the exception, Garcia never had any encounter with Samuel Velasco, and his testimony was only orchestrated by the government to obtain Velasco's conviction. That course respects our adversarial system. This is only a prudential convenience of our adversarial system from the inquisitorial of one. The typical promotion of unfairness to a defendant with the finality of obtaining conviction, especially true when one side is represented by a trained, sophisticated lawyer employed by the federal government, the richest, most powerful, and best represented litigant to appear in court and the other side is a manipulated attorney pretending to render fair representation to a blind defendant.

### 3.  Ruben Alejandro Garcia Valdiviezo (aka Homie) and Luis Nieves Ochoa (aka Chino).

Homie and Chino are two individuals essentially known better as Ruben Alejandro Garcia Valdiviezo for Chino, and Luis Nieves-Ochoa for Homie. Both of this individual. According to the record of the present case, both of these individuals worked under the command of Alan Garcia and participated in the multiple kidnappings in Juarez Mexico, and multiple murders in the same city under Alan Garcia's command.

Obviously, because Homie and Chino worked instructed by Alan Garcia, they also worked for Samuel Velasco considering the chain of command as presented by the government through government witness Arturo Garcia among other evidence. Homie and Chino, in joint of Alan Garcia were direct participants in the killing of Francisco Sagredo, Cinthia Sagredo, Ruth Sagredo and Roberto Martinez. Alan Garcia was killed on April of 2009. Homie and Chino are serving a 20-year federal sentence in a Mexican prison for kidnappings that took place in Juarez Mexico.

According to the Government, there was a lot of kidknappings that Samuel Velasco (Velasco) committed through Alan, Chino, and Homie, ranging from 2008, 2009 and all the way to 2012, however, the government as an act of compassion only limited the kidnappings the he introduced only until when Alan Garcia died.

The government was on notice that it was Homie, Chino and Alan Garcia the participants of the multiple kidnappings and murders Francisco Sagredo, Cinthia Sagredo, and Ruth Sagredo, the same government was on notice that Homie and Chino were part of Alan Garcia's hit team. In fact, it was the same government who admitted during trial that he personally interviewed both of those individuals.

When the government was asked if Homie and Chino were being extradited to face the murder of Francisco Sagredo, Ruth Sagredo and Cinthia Sagredo, the government confirmed during trial that the United States was not looking to extradite those individuals. Contradicting when accounting that all man are to be treated equally, since Alan Garica, Chino and Homie according to the government were part of this case, and mayor participants.


Q. What was Alan Garcia's central role in these murders?

A. Alan Garcia was part of who planned it, and he was a hit man.

Q. Okay. Was – what was his level of involvement? Was he in charge? Was he, you know, not in change?

   A. He was in charge of the hit team.

   **(Motion Hearing of October 5, 2016 Pg. 27)**

**BY MR. BENJAMIN:**

Q. Briefly, Agent, to pick up on the Government's last
question.
Homie and Chino are two individuals essentially known
better as Ruben Alejandro Garcia Valdiviezo for Chino, and Luis
Nieves-Ochoa for Homie, correct?
A. Correct.
Q. And you've sat down with both of those individuals,
correct?
A. Yes, I have.

Q. Both of those individuals were part of Alan Garcia's

alleged hit team, correct?

A. Correct.

Q. Okay. And both of those individuals have denied this,

correct?

A. Correct.

THE COURT: Have they been charged?

MS. NEWAZ: They're in federal prison in Mexico

serving 20-year sentences for participation in kidnappings,

MS. NEWAZ: I am currently not trying to extradite

those individuals.

### (Motion Hearing of October 5, 2016 Pg. 28)

The operative question to be presented to this court is, why the government upon
notice that Homie and Chino were mayor participants in this case made no attempt
in extraditing then to face the murders in the United States?

## 4. Dalia Valencia's Car Rental Records.

At trial, Arturo Garcia testified that the Velasco family often used rental cars to further their kidnapping pursuits. Arturo also testified that Velasco and his cohorts used rental cars to conduct surveillance of the murder victims and to watch at least one of the murders. The Government then introduced rental car records, which indicated that Dalia Velasco frequently rented cars.

According to government witness Arturo Valencia's testimony, Samuel Velasco Gurrola's sister, Dalia Valencia was a mayor participant in this case. Her role was to rent cars so the hit man could used then in Juarez for different purposes in the commission of many kidnappings and most important in the Killing of Francisco Sagredo.

Q. And did Arturo Garcia tell you that Dalia Valencia did

anything in order to obtain equipment or other items for use by

the kidnapping team?

A. Yes. Dalia was to rent vehicles in order – for the hit

team to use, either for surveillance or to carry out the

murders in Mexico.

 (Motion Hearing of October 5, 2016) (Pg 18)


According to government Exhibit 37, showed a rental agreement of a particular vehicle by Dalia Valencia according to Arturo Garcia's testimony and the investigation of Samuel Velasco for these murders, Exhibit 37 corroborated what Arturo Garcia had told the government with regard to Dalia Valencia renting a vehicle for use in the murders.

 According to the the government, a vehicle Silver Pontiac was rented at Avis Rental Car Company the day before the murder on October 2, 2008 and it was returned the day of the murder on October 3, 2008. And it was a silver – silver APC. (Mot. Hearing of Act. 5, 2016 Pg. 20) According to the government's theory of the case, vehicle was used either for surveillance or to carry out the murders.

Trial counsel failed to conduct its own investigation respecting car rental agreements, credit cards records of Dalia Valencia, Port of Entry records to disprove that the testimony of nothing but lies in pursuing Samuel Velasco's conviction.

In the United States no one can rent a car without a credit cart on hand. The record of a credit card may reveal when and at what time the credit card was used. In this case, Dalia Valencia's credit cards reveal that in fact she indeed rented a car during the tame when the murders were committed, but not on the October the 2th, neither car was returned on October the 3rd as the government presented during trial. **Credit Card Records are to be Amended to this Motion.**

Also, Port of Entry Immigration records could have revealed that such a vehicle record of departure and entrance back to the United States does not concede to the evidence presented during trial.

Samuel Velasco's trial counsel render ineffective assistance by not presenting imminent records to disprove the testimony of witness Garcia, and most important to contradict the government's theory in this case. If attorney has presented this evidence, the outcome of the proceedings could have been different. In this case, many points where government acted contrary to the mandates of constitutional rights could have ben avoided but for trial counsel's ineffectiveness.


## COMULATIVE EFFECT OF INEFECTIVE ASSISTANCE OF COUNSEL


Velasco-Gurrola claims ineffective assistance of counsel based on the cumulative effect of deficient performance by his defense counsel under the above-mentioned facts and cumulative errors made by his counsel. The Supreme Court has held that in the context of a claim of ineffective assistance of counsel, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." United States v. Cronic, 466 U.S. 648, 659 n. 26 (1984).

Here but for counsel errors in pursuing, investigating, and challenging government's evidence as described above, the outcome of Velasco-Gurrola could have been different. Trial counsel could have undermined government's witness's reliability and the outcome could have been different.

23

Velasco should prevail based on the cumulative counsel errors as he allowed the government to act outside the scope of a partial and just prosecution in violation of the Fifth and Sixth Amendment to the Constitution.

## STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

The United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). A showing of ineffective assistance of counsel requires that (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. Counsel's deficient performance must be determined by showing that "counsel's representation fell below an objective standard of reasonableness." Id. at 688. To prove prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. A court need not address both parts of an ineffective assistance of counsel claim if the defendant fails to make a sufficient showing of one part of the Strickland test. "Failure to meet either the deficient performance prong or the prejudice prong will defeat a claim for ineffective assistance of counsel." Id. at 700.

For the purposes of federal habeas review, scrutiny of counsel's performance "must be highly deferential." Id. at 689. A court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." <u>Ray v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999). Furthermore, "[a] fair assessment of [counsel's] performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Furthermore, the Fifth Circuit has explained that, "[a] conscious and informed division on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." <u>Martinez v. Dretke</u>, 404 F.3d 878, 885 (5th Cir. 2005)(quoting

United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002)).

## V. CONCLUSION

For the foregoing reasons, this Court should vacate Velasco-Gurrola's sentence and conviction and grant relief as this court deem appropriate under the circumstances of the case.

Executed and Signed this 29 day of October, 2019

Respectfully Submitted

*Samuel Velasco Gurrola*

**Samuel Velasco-Gurrola**
**Reg No. 51956-380**
USP CANAAN
U.S. PENITENTIARY
P.O. BOX 300
WAYMART, PA 18472

## CERTIFICATE OF SERVICE

I, Samuel Velasco-Gurrola, hereby certify that I have served a true and correct copy of the following Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C 2255 by a Person in Federal Custody to the United States District Attorney's Office of the Western District of Texas, El Paso Division, and deposited same in the United States mailing system at the United States Penitentiary, Canaan on this 29 day of October, 2019.

Respectfully Submitted

Samuel Velasco Gurrola